CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED
FEB 04 2021
JULIA C. DUDLEY, CLERK
BY: s/ H. MCDONALD
     DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division**

**PATRICIA ALBERTA NEWELL,**

    **Plaintiff,**

v.

**CARTER BANK & TRUST,**

Serve:
    **Joyce A. Parker,
    Registered Agent
    1300 Kings Mountain Road
    Martinsville, VA 24112-0000**

    **Defendant.**

Case No: 4:21CV00007

**JURY TRIAL DEMAND**

## COMPLAINT

COMES NOW, Patricia Alberta Newell ("Ms. Newell" or "Plaintiff"), by counsel, and states as her Complaint against Defendant Carter Bank & Trust (hereinafter, "Carter Bank & Trust" or "the Bank"), the following:

### I. JURISDICTION AND VENUE

1. This Court has jurisdiction over this matter as it arises from the federal questions presented by the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 through 634 ("ADEA") and the Americans with Disabilities Act, as codified under Title 42 U.S.C. §§ 12101 *et seq.* and the ADA Amendments Act of 2008 ("ADA"). *See generally* 28 U.S.C. § 1331; 28 U.S.C. § 1343(a)(4).

2. Venue is appropriate as the acts and/or omissions of Defendant from which the causes of action arise occurred within the Western District of Virginia. *See* 28 U.S.C. § 1391(b)(2).

1

3. Due to its contacts within the Commonwealth of Virginia, Defendant avails itself to the jurisdiction of this Court.

4. Plaintiff timely filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") in or about August of 2020. Plaintiff received a Dismissal and Notice of Rights from the EEOC dated January 15, 2021 (Attached as Exhibit A). Plaintiff files suit within ninety (90) days of receipt of that Dismissal and Notice of Rights.

## II. THE PARTIES

5. Ms. Newell is a citizen of the United States and a resident of the Commonwealth of Virginia. Ms. Newell was born in September of 1952 and is currently 68 years of age.[1]

6. Carter Bank & Trust is a stock corporation organized under the laws of the Commonwealth of Virginia and doing business in the Commonwealth of Virginia and elsewhere. The Bank's principal office is located at 4 East Commonwealth Blvd., Martinsville, VA 24112.

7. At all times material hereto, Carter Bank & Trust employed approximately more than 400 persons and is a "person" and an "employer" and is engaged in an industry affecting commerce within the meaning of the ADEA, 29 U.S.C. § 630. Carter Bank & Trust is likewise an "employer" within the meaning of the ADA.

---

[1] Ms. Newell's exact date of birth is not included due to privacy concerns, and due to filing requirements as per the United States District Court Western District of Virginia Local Rules.

## III. FACTUAL ALLEGATIONS

### Ms. Newell had an 18+ year successful career with Carter Bank & Trust until the founder, Mr. Carter, passed away.

8. Ms. Newell was hired by Carter Bank & Trust on or about January 17, 1999 as a Drive-Thru Teller.

9. Ms. Newell was hired by the Bank's founder, Worth Harris Carter, Jr. ("Mr. Carter"), who served as President, Chief Executive Officer, and Chairman of the Board of Directors.

10. During her career with Carter Bank & Trust, Ms. Newell rose through the ranks, and ultimately obtained the position of Assistant Vice President, Branch Manager of the Falmouth, Virginia branch, located at 175 Warrenton Road, Falmouth, VA 22405.

11. Prior to her termination from employment on or about May 1, 2020, Ms. Newell had worked at Carter Bank & Trust for almost 21 years, was fully capable of working, and had no immediate plans to retire.

12. Ms. Newell's work performance was always excellent and consistently met or exceeded Carter Bank & Trust's expectations.

13. Barbara Zaccagnino, Area Manager, informed Ms. Newell in the fall of 2019 that "customers came to Falmouth because of [Ms. Newell]. They knew [Ms. Newell] would always do her best for them."

### Since Mr. Carter's death, the Bank's new executive team has engaged in an unlawful scheme to reduce the average age of the Bank employees.

14. For the past few years, beginning after Mr. Carter passed away in April of 2017, Carter Bank & Trust has engaged in a clear and systematic effort to employ younger employees, and has engaged in a pattern and practice of discriminating against its older workers in violation of the ADEA.

15. For example, Donna Burnopp, who is of similar age to Ms. Newell, was terminated from employment in July of 2019 after her position was split into three positions and given to substantially younger employees with less experience.

16. When Ms. Burnopp was terminated from employment shortly thereafter, Ms. Zaccagnino informed Ms. Newell that Carter Bank & Trust now had "younger voices to speak up and fight for" the Bank, referring to the replacement of Ms. Burnopp with younger employees.

17. Within this same conversation, Ms. Zaccagnino then asked Ms. Newell when she planned to retire.

18. Ms. Newell and Ms. Burnopp are far from alone with respect to suffering age discrimination at the hands of Carter Bank & Trust.

19. For example, Bill Oeters, another employee who is of similar age to Ms. Newell and Ms. Burnopp, resigned in 2018 after Carter Bank & Trust informed him that he would not be receiving an annual, expected raise.

20. Numerous other employees, including, but not limited to, Brad Kendrick, Vicki Craig, Stan Foley, and Chuck Martin, also have recently experienced age discrimination at Carter Bank & Trust.[2]

21. Indeed, Mr. Kendrick, who recently was terminated by Carter Bank & Trust after filing suit in federal court against the Bank, was present at a meeting in which Matt Speare, EVP, Chief Information Officer, displayed on an overhead projector the number

---

[2] Mr. Kendrick's amended complaint, filed in the United States District Court for the Western District of Virginia, Case No. 4:19-cv-00047, is incorporated by reference as if set forth fully herein. Ms. Burnopp's complaint, filed in the United States District Court for the Western District of Virginia, Case No. 4:20-cv-00052, is incorporated by reference as if set forth fully herein.

4

of employees at Carter Bank & Trust, along with the average age of the employees, and stated that "all of us sitting around the table are getting older," and "the Bank needs to hire younger employees."

**Carter Bank & Trust denied its older employees proper pay increases.**

22. In addition, giving raises to younger employees and not giving raises to older employees has been a pattern and practice at Carter Bank & Trust for the last several years.

23. For example, in spring of 2019, upon information and belief, Carter Bank & Trust's Customer Service Representatives were all given raises.

24. At this time, Alycia Garcia, in her twenties, was given a 6% pay raise, while Evelyn Frulla, in her fifties, was only given a 2% pay raise.

25. Ms. Frulla was informed that she would receive an additional 4% raise in June of 2019 if she moved to the drive thru. Ms. Frulla accepted the move to the drive thru but was never given the additional raise.

26. Ms. Newell thereafter asked Ms. Zaccagnino, Debbie Kerr, Operations Area Manager, Kathy Gravely, Retail Delivery Director, and Human Resources personnel several times to provide the promised raise; all agreed Ms. Frulla was entitled to the raise, but Ms. Frulla never received a pay increase.

27. Similarly, in spring of 2019, Matt Martin, who was in his thirties, received a larger raise than Susie Jarrett, who was in her fifties and had more than twenty-five years of experience.

28. Then, in June of 2019, Mr. Martin received another raise and Ms. Jarrett did not.

29. Mr. Martin's starting salary also was higher than Ms. Jarrett's salary, despite the fact that Ms. Jarrett had superior experience.

30. Moreover, Mr. Martin has now been promoted to Branch Manager of the Falmouth, Virginia branch, Ms. Newell's previously held position. And, Mr. Martin is compensated at the rate of approximately $8,000 more per year than Ms. Newell.

### Ms. Newell suffered age-related discrimination, false accusations, unwarranted discipline, and harassment about her retirement plans from her Carter Bank & Trust supervisors and colleagues.

31. With respect to Ms. Newell, Jonathan Rhatigan, Regional Operations Manager, visited the Falmouth Branch location in 2019. While there, Mr. Rhatigan asked Ms. Newell when she planned to retire.

32. Continuing thereafter, Carter Bank & Trust's management frequently questioned Ms. Newell about "how much longer are you going to stay?" Ms. Newell estimates that she received this query on at least ten separate occasions between September 2019 and March 2020.

33. Similarly, Ms. Newell witnessed Ms. Zaccagnino, during Huddle Debrief Meetings, make discriminatory statements such as, "the younger employees want to learn unlike some older employees."

34. Additionally, when a younger manager would make a suggestion during one of these meetings, the response was always "terrific" or "very good"; whereas, when Ms. Newell made a suggestion, it was never met with enthusiasm.

35. Then, in December of 2019, Ms. Newell took a vacation.

36. When Ms. Newell returned to work, Ms. Newell was falsely accused by Trevor Denny, Human Resources, of stating that an employee came to work intoxicated.

37. Ms. Newell had not stated that an employee came to work intoxicated.

6

38. After Ms. Newell refuted the accusation, the story of when and what Ms. Newell had allegedly said was changed several times, all versions of which were not true.

39. Mr. Denny then proceeded to state that he needed to speak with Ms. Newell about a write-up for a teller for a drawer shortage that was issued to the teller several months prior, alleging that the form had not been filled out correctly.

40. As Ms. Newell explained to Mr. Denny, the write-up form was provided to Ms. Newell by Ms. Kerr (Ms. Zaccagnino's supervisor).

41. Ms. Newell filled out the form and provided it back to Ms. Kerr, who then asked that Ms. Newell make some changes to the form, which Ms. Newell completed and returned to Ms. Kerr. Ms. Kerr approved the form and asked Ms. Newell to send the form to Human Resources, which Ms. Newell did.

42. As Ms. Newell was explaining the approval process that she went through prior to submitting the form, Ms. Zaccagnino, who was also present for this discussion, then interjected that Ms. Newell should have sent the form to her first.

43. Ms. Newell apologized for any miscommunication and indicated that she would ensure to do so in the future.

44. Notably, again, Ms. Zaccagnino was Ms. Kerr's subordinate, and Ms. Newell had followed Ms. Kerr's instructions on how to handle the form.

45. Ms. Zaccagnino then informed Ms. Newell that Ms. Newell was being written up for not completing a drawer shortage write-up form for an employee for an incident that occurred while she was on vacation, despite the fact that Ms. Newell could not write up a form for a shortage while on vacation.

46. Then, after Mr. Denny left, Ms. Zaccagnino told Ms. Newell to not write up the shortage form that she had just been disciplined for not completing when she was on vacation because Ms. Zaccagnino did not want a shortage form in a "young teller's" personnel file.

47. Ms. Zaccagnino then asked if Ms. Newell planned to retire after being on vacation.

48. Thereafter, Stan Foley, Facilities Personnel, and Olivia Karavantakis, Head of Facilities, separately stopped by Ms. Newell's branch to ask Ms. Newell if she had plans to retire and/or a specific retirement date.

49. On January 22, 2020, Ms. Newell attended a training session led by Mr. Rhatigan.

50. Ms. Newell was the first to complete her assessment at the end of the training.

51. Mr. Rhatigan informed Ms. Newell that he was surprised that she was the first employee to complete the assessment, checked her work, and then indicated that he was surprised it was correct.

52. Mr. Rhatigan did not check anyone else's work at the training.

53. After the training was over, Mr. Rhatigan, Ms. Zaccagnino, and Ms. Kerr came to Ms. Newell's branch and ordered that Ms. Newell and Ms. Jarrett shred files.

54. Ms. Newell indicated to them that the files had not yet been reviewed to see if the files contained any information that should not be shredded. Ms. Newell was informed to shred the files anyway, and she did as instructed.

55. Two (2) days later, Ms. Zaccagnino called Ms. Newell and asked for copies of certain documents.

56. Ms. Newell informed Ms. Zaccagnino that she could not provide copies of the documents because the documents were shredded, as instructed, two (2) days prior.

57. Ms. Zaccagnino became angry that copies of the documents could not be provided, despite the fact that she had ordered that the documents be shredded.

58. Then, in February of 2020, Ms. Newell was informed by tellers that worked at a location where Ms. Zaccagnino, Mr. Rhatigan, and Ms. Kerr frequently worked that the tellers had heard that she (Ms. Newell) was retiring soon.

59. On information and belief, the tellers were told this by Ms. Zaccagnino, Mr. Rhatigan, and/or Ms. Kerr.

60. Again, Ms. Newell did not intend on retiring in the near future.

61. Then, on March 2, 2020, during a meeting with Ms. Kerr, Ms. Zaccagnino, and Mr. Rhatigan, both Virginia Cassell, Lake Ridge Manager, and Ms. Newell were questioned about retiring as, according to management, Carter Bank & Trust needed "to make room for these young people coming up" and "young people really like to learn unlike the old people."

62. Neither Ms. Cassell nor Ms. Newell indicated that they had a present intent to retire.

63. After the meeting, Ms. Newell was asked to stay behind, alone. Ms. Kerr then told Ms. Newell that Ms. Zaccagnino would be stopping by each week, if not more, to "check on" Ms. Newell.

64. In March of 2020, Ms. Zaccagnino told Ms. Newell, when discussing how to handle potential staff reductions due to economic concerns caused by COVID-19, that it was time for long-term employees to retire so that younger tellers could keep their jobs, and that it would be "done one way or another."

9

65. Paul Carney, Human Resources, also stated that Carter Bank & Trust would not move forward with staff cuts because it would not be fair to send "young tellers" to find employment in a difficult job market.

66. Mr. Carney stated further that terminations would only occur if the violation was blatant and criminal.

67. Ms. Gravely also stated during a virtual meeting where all employees were present that it was time for long-term employees to retire.

68. After that meeting, two Chatham Heights tellers told Ms. Zaccagnino that they would retire.

69. Then, in late March of 2020, a customer came into the Falmouth branch to see Ms. Newell "before she retired." Ms. Newell, surprised as she was not retiring, asked the customer where he heard she was retiring. The customer informed Ms. Newell that Mr. Rhatigan had told him that Ms. Newell was retiring.

70. Then, in April of 2020, during a Huddle Debrief Meeting, Ms. Zaccagnino asked Shayla Biello, Chatham Heights Branch Manager, if Mr. Rhatigan had been able to fix an error she made. Ms. Biello indicated that Mr. Rhatigan had fixed the error. Ms. Zaccagnino responded that Ms. Biello had violated policy, but that Mr. Rhatigan had fixed the error so that Ms. Biello would not be written up for the policy violation.

71. Ms. Biello is in her twenties.

### Ms. Newell suffers from Minimal Change Disease, Graves' disease, Casselman's disease, and Diverticulosis, and Carter Bank & Trust has Terminated Other Employees Due to their Serious Medical Conditions.

72. Ms. Newell suffers from Minimal Change Disease, Graves' disease, Casselman's disease, and diverticulosis, which affect major life activities, such as eating, speaking and walking.

73. These conditions are exacerbated by stress, sitting for long periods of time, and use of the computer screen.

74. While employed with Carter Bank & Trust, some days it would take longer than usual for Ms. Newell's medication to work, and, therefore, her speech would be off, and she would be wobbly. Ms. Newell's co-workers would joke that she had been out drinking the night before. Ms. Newell's co-workers were aware that she did not actually drink alcohol.

75. Ms. Newell's supervisors, including but not limited to Barbara Zaccagnino and Jonathan Rhatigan, were aware of Ms. Newell's medical conditions.

76. Ms. Zaccagnino and Mr. Rhatigan both displayed a negative attitude towards Ms. Newell concerning her disabilities.

77. Alex Lloyd, Former Fredericksburg Route 3 Branch Manager, was terminated from employment when he was out of work having a health procedure performed for a serious medical condition.

78. Jonathan Furnia was thereafter announced as the Branch Manager of the Route 3 branch. Jonathan Furnia is a substantially young male (approximately in his thirties), upon information and belief, without disabilities.

79. Thus, on information and belief, Carter Bank & Trust has a pattern and practice of discriminating against individuals on the basis of their actual or perceived disabilities.

### Carter Bank & Trust unlawfully and pretextually terminated Ms. Newell's employment and retaliated against her for participating in protected conduct.

80. On or about May 1, 2020, Ms. Newell was terminated from employment for allegedly handling a form incorrectly.

81. The accusation was entirely false, and Ms. Newell had followed all instructions for the form provided by Ms. Zaccagnino.

82. When Ms. Newell was informed that she was being terminated from employment, Ms. Kerr stated to her, "at least we are not embarrassing you in front of customers and staff like we did to Donna," referring to the fact that Ms. Burnopp was walked out of Carter Bank & Trust, in front of her customers and employees, like she had committed a crime.

83. Additionally, at the time she was terminated from employment, Ms. Newell's supervisors were aware that Ms. Newell was going to be a witness in Ms. Burnopp's related matter against Carter Bank & Trust.

84. Notably, at a retirement party for a former co-worker, Ms. Burnopp's termination from employment and her legal matter was a topic of conversation.

85. Ms. Newell indicated at that time that she would be honest no matter what the situation was and that being under oath requires everyone to be honest.

86. Ms. Newell was replaced by a substantially younger individual, Mr. Martin, who is in his thirties.

87. Upon information and belief, Carter Bank & Trust unlawfully and pretextually terminated Ms. Newell's employment because of her age and/or disability and her anticipated participation in the proceedings related to Ms. Burnopp's ADEA discrimination claims against the Bank.

88. Because the actions taken against Ms. Newell were taken by supervisory employees at Carter Bank & Trust within the scope of their employment, Carter Bank & Trust is responsible for their actions based upon the doctrine of *respondeat superior.*

## COUNT I:  CLAIM FOR DISCRIMINATION AND HARASSMENT IN VIOLATION OF THE ADEA

89. Plaintiff incorporates by reference herein the preceding paragraphs of this Complaint.

90. At the time of her termination from employment, Plaintiff was 67 years of age, and protected from age discrimination by the ADEA.

91. Prior to Plaintiff's termination from employment, she was performing her work at a satisfactory level and meeting the legitimate business expectations of Defendant.

92. Upon information and belief, Defendant has engaged in a systematic and unlawful effort to hire and retain younger employees, resulting in a pattern and practice of unlawfully discriminating against and terminating older employees, in violation of the ADEA.

93. During her employment with Defendant, Plaintiff experienced a hostile work environment based upon her age.

94. During her employment with Defendant, Plaintiff experienced unwelcome discrimination based upon her age, endured related harassment and unwarranted

discipline, was treated differently, and less preferably than younger employees, and ultimately was terminated from employment.

95. Defendant's conduct towards Plaintiff was discriminatory and intentional, and no business-related legitimate reason justified the actions taken against her as, prior to Plaintiff's termination from employment, she was performing her work at a satisfactory level.

96. Defendant would not have terminated Plaintiff's employment, or taken the other discriminatory actions against her, but for Plaintiff's age.

97. Any reasons cited by Defendant for Plaintiff's termination from employment were pretextual, as Plaintiff's work performance was meeting Defendant's legitimate business expectations.

98. After Plaintiff's termination, her job duties were taken over by an individual who is younger than Plaintiff.

99. Matt Martin took over Plaintiff's job duties after her termination. Mr. Martin is in his thirties.

100. As a direct and proximate result of Defendant's actions, Plaintiff has suffered and will continue to suffer pecuniary loss.

101. At all times material hereto, Defendant engaged in a discriminatory practice or practices with malice or reckless indifference to the federally protected rights of Plaintiff so as to support an award of liquidated damages.

102. The above-described acts by Defendant and employees of Defendant constitute age discrimination and hostile work environment in violation of the Age Discrimination in Employment Act, as codified under Title 29 U.S.C. §§ 621 through 634 ("ADEA").

### COUNT II:  CLAIM FOR RETALIATION IN VIOLATION OF THE ADEA

103. Plaintiff incorporates by reference herein the preceding paragraphs of this Complaint.

104. At the time of her termination from employment, Plaintiff was 67 years of age and protected from age discrimination and retaliation by the ADEA.

105. Prior to Plaintiff's termination from employment, she was performing her work at a satisfactory level and meeting the legitimate business expectations of Defendant.

106. Upon information and belief, Defendant has engaged in a systematic and unlawful effort to hire and retain younger employees, resulting in a pattern and practice of unlawfully discriminating against and terminating older employees, in violation of the ADEA.

107. Plaintiff both experienced and witnessed Defendant's unlawful conduct and engaged in the protected conduct of opposing age discrimination by announcing her anticipated participation in a related ADEA proceeding against Defendant. *See* 29 U.S.C. § 623(d); *Moore v. Mt. States Health All.*, No. 2:16CV00014, 2016 U.S. Dist. LEXIS 137307, at *5 (W.D. Va. Oct. 4, 2016) ("A plaintiff has engaged in 'protected activity' if she has (a) opposed a practice made unlawful by the ADEA or (b) participated in a proceeding brought under the ADEA.") (citing *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 406 (4th Cir. 2005)).

108. Defendant violated federal law by permitting a work environment to exist that was discriminatory, hostile, and offensive to Plaintiff and other employees engaging in protected activity, and that punished, retaliated against, and prejudiced such employees for such engagement by subjecting Plaintiff to discrimination,

harassing Plaintiff about her retirement plans, levying unwarranted discipline upon her, and treating Plaintiff differently, and less preferably than similarly situated younger employees – ultimately resulting in Plaintiff's termination from employment.

109. Plaintiff was unfairly terminated from employment in direct retaliation for her engagement in the protected activity of opposing a practice made unlawful by the ADEA and participating in an ADEA proceeding against Defendant.

110. Defendant would not have terminated Plaintiff or taken the other discriminatory and retaliatory actions against her, but for Plaintiff's age and engagement in protected activity.

111. The discriminatory and retaliatory actions taken against Plaintiff, including Defendant's termination of Plaintiff's employment, are causally connected to Plaintiff's age and engagement in protected activity.

112. Any reasons cited by Defendant for Plaintiff's termination from employment were pretextual as Plaintiff's work performance was meeting legitimate business expectations.

113. After Plaintiff's termination, her job duties were taken over by an individual who is younger than Plaintiff.

114. Matt Martin took over Plaintiff's job duties after her termination. Mr. Martin is in his thirties.

115. As a direct and proximate result of Defendant's actions, Plaintiff has suffered and will continue to suffer pecuniary loss.

116. At all times material hereto, Defendant engaged in discriminatory and retaliatory practices with malice or reckless indifference to the federally protected rights of Plaintiff so as to support an award of liquidated damages.

117. The above-described acts by Defendant and employees of Defendant constitute retaliation in violation of the Age Discrimination in Employment Act, as codified under Title 29 U.S.C. §§ 621 through 634 ("ADEA").

### COUNT III: CLAIM FOR DISCRIMINATION IN VIOLATION OF THE ADA

118. Ms. Newell incorporates herein by reference the preceding paragraphs of this Complaint.

119. At all times relevant to this Complaint, Ms. Newell was a qualified individual with disabilities, pursuant to the ADA.

120. Specifically, and at all times relevant, Ms. Newell suffered from Minimal Change Disease, Graves' disease, Casselman's disease, and diverticulosis, which impaired several of Ms. Newell's daily life activities and/or functions including eating, speaking, and walking. and working standing for an extended period of time.

121. In the alternative, Ms. Newell was regarded by the Bank as having such impairments.

122. At all times relevant, however, Ms. Newell could perform the essential functions of her job with or without an accommodation.

123. At all times, Ms. Newell performed her work at a satisfactory level, meeting or exceeding the legitimate business expectations of the Bank.

124. While employed with Carter Bank & Trust, some days it would take longer than usual for Ms. Newell's medication to work, and, therefore, her speech would be off, and she would be wobbly. Ms. Newell's co-workers would joke that she had been out

drinking the night before. Ms. Newell's co-workers were aware that she did not actually drink alcohol.

125. Ms. Newell's supervisors, including but not limited to Barbara Zaccagnino and Jonathan Rhatigan, were aware of Ms. Newell's medical conditions.

126. Ms. Zaccagnino and Mr. Rhatigan both displayed a negative attitude towards Ms. Newell concerning her disabilities.

127. The Bank discriminated and harassed Ms. Newell by causing a hostile work environment and treating Ms. Newell differently, and less favorably than similarly situated employees – ultimately resulting in Ms. Newell's unlawful termination from employment.

128. The Bank would not have engaged in the foregoing acts but for Ms. Newell's disabilities and/or the Bank regarding Ms. Newell as having such disabilities.

129. Any reasons given by the Bank for its treatment of Ms. Newell are pretextual, as Ms. Newell's work performance was excellent.

130. Alex Lloyd, Former Fredericksburg Route 3 Branch Manager, was unlawfully terminated from employment when he was out of work having a health procedure performed for a serious medical condition.

131. Thus, on information and belief, Carter Bank & Trust has a pattern and practice of discriminating against individuals on the basis of their actual or perceived disabilities.

132. Ms. Newell's termination from employment occurred under circumstances that raise a reasonable inference of unlawful discrimination based upon her disabilities and/or the Bank regarding Ms. Newell as having such disabilities.

133. As a direct and proximate result of the Bank's actions, Ms. Newell has suffered and will continue to suffer pecuniary loss, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

134. At all times material hereto, the Bank engaged in unlawful or discriminatory practices with malice or reckless indifference to the federally protected rights of Ms. Newell so as to support an award of punitive damages.

135. The above-described acts by the Bank and employees of the Bank constitute disability discrimination in violation of the Americans with Disabilities Act, as codified under Title 42 U.S.C. §§ 12101 *et seq.*, and the ADA Amendments Act of 2008 ("ADA").

WHEREFORE, Plaintiff Patricia Alberta Newell prays for judgment against Defendant Carter Bank & Trust, and for lost wages and benefits, equitable relief, compensatory damages, punitive damages, and/or liquidated damages, together with prejudgment interest from the date of Ms. Newell's termination from employment, and for costs and attorneys' fees, and for such other and further relief as may be just and equitable.

TRIAL BY JURY ON ALL CLAIMS, INCLUDING WHETHER THE CLAIMS ARE SUBJECT TO ARBITRATION, IS DEMANDED.

Respectfully Submitted,

**PATRICIA ALBERTA NEWELL**

/s/ Brittany M. Haddox_____
Thomas E. Strelka, Esq. (VSB# 75488)
L. Leigh R. Strelka, Esq. (VSB # 73355)
N. Winston West, IV, Esq. (VSB # 92598)
Brittany M. Haddox, Esq. (VSB # 86416)
Monica L. Mroz, Esq. (VSB #65766)
STRELKA EMPLOYMENT LAW
Warehouse Row
119 Norfolk Avenue, S.W., Suite 330

Roanoke, VA  24011
Tel:  540-283-0802
thomas@strelkalaw.com
leigh@strelkalaw.com
winston@strelkalaw.com
brittany@strelkalaw.com
monica@strelkalaw.com

*Counsel for Plaintiff*