CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

FEB 21 2023

LAURA A. AUSTIN, CLERK
BY: s/ H. MCDONALD
DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION**

| | | |
|---|---|---|
| **PATRICIA NEWELL,** | ) | |
| **Plaintiff,** | ) | **Civil No. 4:21-cv-007** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **CARTER BANK & TRUST,** | ) | **By:    Michael F. Urbanski** |
| **Defendant.** | ) | **Chief United States District Judge** |

## MEMORANDUM OPINION

This matter is before the court on defendant Carter Bank & Trust's motion for summary judgment, ECF No. 54, under Rule 56(a) of the Federal Rules of Civil Procedure. For the reasons discussed below, the court will **GRANT** defendant's motion for summary judgment.

## I. Background

The following facts are taken from the summary judgment record and are considered in the light most favorable to the plaintiff. Patricia Newell began working at Carter Bank & Trust (CB&T) in 1999. Pl. Memo. Opp. Summ. J., ECF No. 57, at 2. She went on to hold several positions, eventually becoming an Assistant Vice President at the Falmouth Branch. Id.

Worth Carter, the founder of CB&T, died in April of 2017. Id. Newell believes that his death contributed to a change in the culture of the bank, one that shifted to a focus on the younger staff. Id. This shift in culture led to the demotion and eventual termination of Newell's

supervisor, Donna Burnopp.[1] Id. After Burnopp's termination, Debra Kerr, Jonathan Rhatigan, and Barbra Zaccagnino took over as Newell's supervisors. Id. According to Newell, Zaccagnino stated that this replacement was part of the bank's efforts to have "younger voices to speak up and fight for the bank." Id.; ECF No. 57-1, at 265.

In June 2019, Newell received a performance review from Kerr that stated that she "exceed[ed] expectations" or "me[t] expectations" in each category. Pl. Memo. Opp. Summ. J., ECF No. 57, at 4; ECF No. 57-13. The review noted that Newell "struggled with the computer" but that "a lot of her problems [were] medical" and that she still met expectations on this criterion. ECF No. 57-13. It also noted that "sometimes it may take [Newell] a little longer and she may need a little extra support" when it came to the "personal development" assessment. Id.

On two occasions in the summer of 2019, Newell expressed her opposition to what she viewed as discriminatory termination of her former supervisor, Donna Burnopp, to CB&T management. Pl. Memo. Opp. Summ. J., ECF No. 57, at 4. She told Zaccagnino that she thought Burnopp had been subject to age discrimination by CB&T, and that if Newell was ever asked about it, she would "tell the truth" about it. Pl. Memo. Opp. Summ. J., ECF No. 57, at 4; ECF No. 57-1, at 284.

In the fall of 2019, members of CB&T management asked Newell about her retirement plans on several occasions. Rhatigan asked Newell when she was planning to retire "out of the blue" during a visit to the Falmouth branch of CB&T. Pl. Memo. Opp. Summ. J., ECF No.

---

[1] Burnopp filed her own age discrimination lawsuit, Burnopp v. Carter Bank & Trust, No. 4:20-cv-0052, which was resolved by the parties prior to trial.

57, at 5; ECF No. 57-12, at 28. In December of 2019, Zaccagnino "brought up [Newell's]

retirement" and asked her when she planned to retire. Pl. Memo. Opp. Summ. J., ECF No.

57, at 5; ECF No. 57-12, at 29. Another employee, Donna Howard, told Newell that she had

heard from Zaccagnino that Newell was retiring, and a customer told Newell that he had heard

from Rhatigan that Newell was retiring. Pl. Memo. Opp. Summ. J., ECF No. 57, at 6; ECF

No. 57-12 at 39-40, 41-42. At the time of these conversations, Newell did not have immediate

plans to retire. Pl. Memo. Opp. Summ. J., ECF No. 57, at 7. Bank management also made

statements related to the ages of CB&T employees. Zaccagnino told Newell that "it really

[was] time for people who can [draw Social Security] to leave and make room for the young

tellers coming in" and that if those employees stayed, that the bank would "just make it so

their life here is not enjoyable." Id. Kathy Gravely, the Retail Delivery Director/Retail Banking

Director, stated at a meeting that "it was time for older people to go so younger people could

come in." Id. at 20.

    In September 2019, Newell wrote up one of her supervisees for two issues—once for

"drawer overage" and once for "drawer underage"—in accordance with what she believed to

be CB&T procedure. Id. at 8-9. Paul Carney, Chief Human Resources Officer, indicated to

Newell that there was an issue with the write-up form. Id. at 9. The supervisee's name was

missing from a spot on the form. Id. Then in October, the same supervisee made similar errors

and Newell drafted a disciplinary form. Id. Zaccagnino then told Newell to instead draft two

forms for each separate error, which Newell did. Id. Then, Zaccagnino allegedly disciplined

Newell for not reviewing the counseling memos with Zaccagnino before presenting them to

the supervisee. Id. at 10.

On another occasion, when reviewing a form completed by one of her subordinates, Newell stated that "maybe [the employee] was drunk" when he had filled out the form based on the quality of his responses. Id.; ECF No. 57-1, 128-29. Newell was written up for violating the bank's anti-harassment policy, though Newell argues that she made the comment as a joke. Pl. Memo. Opp. Summ. J., ECF No. 57, at 11. She states that she told management that their incident report had some inaccurate information in it, but that the bank ignored her. Id. at 11-12.

In December 2019, bank management was concerned about a potential Bank Secrecy Act (BSA) issue regarding Customer A. Newell Dep., ECF No. 57-1, at 145. Linda Perryman, a teller at the Falmouth CB&T branch, contacted Zaccagnino because she was suspicious of Customer A's cashier check order. ECF No. 57-3, at 43-45. Zaccagnino learned that this was the latest in a seven- or eight-year series of possibly tax-evasive transactions. Id. at 83-85. She contacted the bank's BSA experts, who told Zaccagnino that for Newell to have missed the earlier transactions she had been either "willfully blind" or "lacked proper banking knowledge." Newell Dep. I, ECF No. 57-1, at 159; ECF No. 55-8, at 41-42. As a result, Zaccagnino placed Newell on a written Performance Action Plan ("PAP") and warned her that she was at risk of termination. Newell Dep. I, ECF No. 57-1, 181-82. She told Newell several times to tell her immediately if Customer A returned and to instruct her tellers to do the same. Pl. Memo. Opp. Summ. J., at 13. Newell instructed her tellers accordingly. Id.

In April 2020, Customer A came into the Falmouth branch while Newell was on her lunch break. Id. at 13. Instead of telling Newell or Zaccagnino, a teller served Customer A before alerting either of them to his presence. Id. The teller then told Zaccagnino that

Customer A had deposited his cashier checks. When Zaccagnino confronted Newell about this, Newell told her that she had been in her office with her daughter and that she had not been involved with the transaction. Newell Dep. I, ECF No. 57-1, at 228. Zaccagnino then requested Newell's termination "based on failure to follow policy/procedure, lack of follow through on action plan and failing to meet leadership expectations." Id. at 233-34; ECF No. 55-10, at 7. Newell was terminated on May 1, 2020.

Newell brought suit under the Age Discrimination in Employment Act, 42 U.S.C. § 623 (ADEA) and the Americans with Disabilities Act Amendments Act (ADAAA), 42 U.S.C. § 12101. Following this court's partial grant of defendant's motion to dismiss, ECF No. 35, the following counts remain: age discrimination in violation of the ADEA (Count I); retaliation in violation of the ADEA (Count II); and disability discrimination in violation of the ADAAA. Am. Compl., ECF No. 13. CB&T has moved for summary judgment on all remaining claims. ECF No. 54.

## II. Legal Standard

Pursuant to Rule 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Glynn v. EDO Corp., 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with [any] affidavits" filed by the parties. Celotex, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under

the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the non-moving party. Glynn, 710 F.3d at 213 (citing Bonds v. Leavitt, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" McAirlaids, Inc. v. Kimberly–Clark Corp., 756 F.3d 307, 310 (4th Cir. 2014) (internal alteration omitted) (citing Tolan v. Cotton, 134 S. Ct. 1861, 1863 (2014) (per curiam)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Anderson, 477 U.S. at 255.

The non-moving party must, however, "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" Glynn, 710 F.3d at 213 (quoting Anderson, 477 U.S. at 252). The non-moving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Res. Bankshares Corp. v. St. Paul Mercury Ins. Co., 407 F.3d 631, 635 (4th Cir. 2005) (quoting Anderson, 477 U.S. at 249). "In other words, to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." Moss v. Parks Corp., 985

F.2d 736, 738 (4th Cir. 1993) (quoting <u>Anderson</u>, 477 U.S. at 248). Even when facts are not in dispute, the court cannot grant summary judgment unless there is "no genuine issue as to the inferences to be drawn from" those facts. <u>World-Wide Rights Ltd. P'ship v. Combe Inc.</u>, 955 F.2d 242, 244 (4th Cir. 1992).

### III. Count I—Age Discrimination

Defendant seeks summary judgment on Newell's ADEA discrimination claim, arguing that Newell not only fails to make out a prima facie case, but also makes insufficient assertions of discrimination to prevail on her claim. Though the complaint alleged both age discrimination and a hostile work environment, Newell now proceeds only on the discrimination allegation. Pl. Memo. Opp. Summ. J., ECF No. 57, at 16.

### A.  Legal Background

Under the ADEA, an employer may not "fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1). "To prevail on an ADEA claim, a plaintiff must prove by a preponderance of the evidence that age constituted the but-for cause of the adverse employment action." <u>Bandy v. City of Salem</u>, No. 21-1565, slip op. at 7 (4th Cir. Feb. 13, 2023) (citing <u>Gross v. FBL Fin. Servs.</u>, 557 U.S. 167, 176 (2009)). The plaintiff may do so through direct or circumstantial evidence. <u>Id.</u> "Importantly, 'an employee cannot prevail on an age discrimination claim by showing that age was *one* of multiple motives for an employer's decision; the employee must prove that the employer *would not have* [taken the adverse employment action] in the absence of age discrimination.'" <u>Id.</u> (emphasis in original) (quoting <u>Westmoreland v. TWC Admin. LLC</u>, 924 F.3d 718, 725 (4th Cir. 2019)). When faced with

only circumstantial evidence, the court employs the burden-shifting framework established in

McDonnell Douglas Corp. v. Green, 411 U.S. 792, 807 (1973).[2] The framework follows three

steps. First, the plaintiff must establish a prima facie case of discrimination. Laber v. Harvey,

438 F.3d 404, 430 (4th Cir. 2006). A plaintiff must meet four elements to make out a prima

facie case of age discrimination. Id. A plaintiff must demonstrate that she 1) was 40 years of

age or older during the events in question; 2) experienced adverse employment action; 3) was

meeting her employer's expectations at the time of the adverse action; and 4) was replaced

with or treated less favorably than someone not insignificantly younger. O'Connor v. Consol.

Coin Caterers Corp., 517 U.S. 308, 311-13 (1996). If a plaintiff meets all the elements, the

burden shifts to the employer to demonstrate a "legitimate, non-discriminatory reason for its

adverse employment decision." Laber, 438 F.3d at 430 (citing Reeves v. Sanderson Plumbing

Prods., Inc., 530 U.S. 133, 142 (2000)). If the employer meets this burden, the plaintiff must

show that the "articulated reason is a pretext for age discrimination." Id. (citing Reeves, 530

U.S. at 142). Even at the summary judgment stage,

> an employer would be entitled to judgment . . . if the record conclusively
> revealed some other, nondiscriminatory reason for the employer's decision, or
> if the plaintiff created only a weak issue of fact as to whether the employer's
> reason was untrue and there was abundant and uncontroverted independent
> evidence that no discrimination had occurred.

Reeves, 530 U.S. at 148. Furthermore, "a plaintiff's own assertions of discrimination in and of

themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory

reasons" for an adverse employment decision. Dockins v. Benchmark Commc'ns., 176 F.3d

---

[2] In O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 311-13 (1996), the Supreme Court assumed, without deciding, that the McDonnell Douglas evidentiary framework applies to ADEA cases. "Nonetheless, the United States Court of Appeals for the Fourth Circuit has continued to apply it in that context . . . ." Cartee v. Wilbur Smith Assocs., Inc., No. 3:08-4132, 2010 WL 5059643, at 2 n.2 (D.S.C. Oct. 6, 2010) (collecting cases).

745, 749 (4th Cir. 1999) (quoting Williams v. Cerberonics, Inc., 871 F.2d 452, 456 (4th Cir. 1989)).

## B. Prima Facie case of discrimination

In this case, the first two elements of the prima facie case are undoubtedly met. Newell, being 67 years old at the time of her termination, is a member of the protected class, and an adverse employment action was taken against her in the form of her termination. Am. Compl., ECF No. 13, at ¶ 95. As for the fourth element, an employee in his thirties took over Newell's job duties after her termination. Id. at ¶ 104. The third element of Newell's claim is disputed by the parties.

CB&T argues that Newell does not make out a prima facie case because she was not meeting the bank's legitimate employment expectations at the time of any adverse actions against her. Def. Memo. Supp. Summ. J., ECF No. 55, at 15. The court agrees.

When considering satisfaction of an employer's expectations, the court looks to the "decision-maker's perception—rather than the self-assessment of the plaintiff—[as] determinative . . . ." Brooks v. Potomic Family Dining Grp. Operating Co. LLC, No. 5:15-cv-049, 2019 WL 1441628 (W.D. Va. March 31, 2019) (citing Dejarnette v. Corning Inc., 133 F.3d 293, 299 (4th Cir. 1998)). Newell does not dispute that she turned in an employee discipline document to Human Resources that was missing the employee's name in September 2019, nor that she was verbally disciplined for it. Newell Dep. I, ECF No. 57-1, at 98-100. She also does not dispute that, when she had similar issues regarding employee disciplinary forms in October 2019, that Barbra Zaccagnino issued her a counseling memorandum that "took issue with the way [Newell] handled" the forms and that indicated to Newell that, if she did

9

not meet CB&T policy again, further disciplinary action—including termination—was possible. Id. at 125-26; ECF No. 55-10, at 9. CB&T next points to the incident when Newell stated that one of her subordinates must have been drunk when completing forms. Def. Memo. Supp. Summ. J., ECF No. 55, at 16; ECF No. 55-10, at 10-11. Newell does not deny making that statement nor being disciplined by CB&T for violating the bank's anti-harassment policy. Newell Dep. I, ECF No. 57-1, at 128-29, 140-41.

Newell also does not dispute that she was on notice regarding CB&T's concerns about her involvement in the issues concerning Customer A. Newell Dep. I., ECF No. 57-1, at 160. CB&T's experts on the Bank Secrecy Act indicated that Newell's actions over the course of seven years amounted to "willful blindness" or "lack of banking knowledge." ECF No. 55-8, at 41-42. An uncontested email from the BSA expert states that Newell should "absolutely" have noticed and reported Customer A's behavior as suspicious. Subsequently, CB&T issued a performance action plan for Newell, which she signed. ECF No. 55-9, at 20-21. The action plan indicated that, if Newell did not meet her employment expectations or failed to comply with CB&T policy, termination was possible. Id. As part of the action plan, Zaccagnino instructed Newell to call her "if and when [Customer A] came back to the branch." Pl. Memo. Opp. Summ. J., ECF No. 57, at 13. Newell instructed her tellers to alert Newell when Customer A came in. When Customer A next came in, the teller allowed him to deposit his check and then alerted Zaccanino herself. Zaccagnino, who understood allowing Customer A to deposit his check to be contrary to her instructions, then recommended Newell's termination. Id. at 28. Newell was subsequently terminated from CB&T.

While Newell argues that she properly followed Zaccagnino's instructions and that her comment about her subordinate being drunk was simply a joke, her own assessment of her job performance is not sufficient to make out a prima facie case. Newell had received several verbal and written warnings regarding her job performance, making it implausible that she was not on notice that CB&T had concerns about her conduct. See Brooks, 2019 WL 1441628, at *5-*6 (explaining that plaintiff could not claim that coaching and counselling sessions, meetings with management, and written warnings "did not alert him that his employer was dissatisfied with his job performance"); id. at *5 ("[D]espite [plaintiff]'s own perception of a job well done, Potomac both found and communicated to [Plaintiff] that he fell short of his expected job performance." (citing Dejarnette, 133 F.3d at 299)); Moore v. Mountain States Health Alliance, 2:16-cv-014, 2018 WL 1309739, at *6 (W.D. Va. March 12, 2018) (finding no prima facie case because plaintiff could "not show[] that she c[ould] present evidence that she was meeting her employer's legitimate expectations at the time of her termination" because "the documented history of her disciplinary problems overcomes her own perceptions of her conduct"). Newell does not dispute that she had a disciplinary record, nor does she dispute Zaccagnino's actual instructions regarding Customer A, which was the final event before her termination. See Pl. Memo. Opp. Summ. J., ECF No. 57, at 13 ("As instructed Newell advised all tellers to notify her if Customer A was doing a deposit, so Newell could notify Zaccagnino.") & Zaccagnino Dep., ECF No. 57-3, at 85 ("I instructed [Newell] to let me know the minute the customer came back in, and I instructed her to tell her staff the same thing."). Even taking Newell's interpretation of the instruction in the light most favorable to her, the "pertinent inquiry is not whether the employee acted in a way so as to warrant termination,

but whether the decisionmaker honestly believed the employee so acted." <u>Bandy v. Advance Auto Parts, Inc.</u>, 7:11-cv-365, 2012 WL 6018741, at \*7 (W.D. Va. Nov. 29, 2012) (citing <u>Holland v. Wash. Homes, Inc.</u>, 487 F.3d 208, 217 (4th Cir. 2007)). The court finds that Newell has not satisfied all the required elements for a prima facie case.

### C. CB&T's legitimate, non-discriminatory reason for termination

Notwithstanding the court's finding, assuming *arguendo* that Newell did meet the requirements for a prima facie case, the burden shifts to CB&T to demonstrate a legitimate, non-discriminatory reason for her termination. "This burden is one of production, not persuasion; it 'can involve no credibility assessment.'" <u>Reeves</u>, 530 U.S. at 142 (quoting <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 511 (1993)).

CB&T has set forth clear reasons for terminating Newell. First, she failed to comply with requirements for employee disciplinary forms which caused problems with the bank's personnel files. Def. Memo. Supp. Summ. J., ECF No. 55, at 6-7, 15. Next, she was disciplined for violating CB&T's anti-harassment policy by making what the bank viewed as a disparaging remark about a subordinate being intoxicated while completing work. <u>Id.</u> at 7-8, 15. She was then written up for failure to file the necessary paperwork regarding Customer A's potential tax-evasive transactions, which CB&T's BSA expert called, at the least, a "lack of banking knowledge." <u>Id.</u> at 9. And finally, Zaccagnino believed that Newell failed to comply with her instructions regarding Customer A's future transactions. <u>Id.</u> at 11-13, 15. As discussed above, Newell does not dispute that CB&T believed there was a reasonable basis for discipline in these situations. Because job performance is "widely recognized as [a] valid, nondiscriminatory bas[is] for any adverse employment decision," <u>Evans v. Tech. Applications & Serv. Co.</u>, 80

F.3d 954, 960 (4th Cir. 1996), CB&T's assessment of Newell's job performance problems is a valid, nondiscriminatory reason for her termination. So long as an employer puts forth a lawful reason for termination, "it is not the court's role to determine if that reason 'was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination.'" Brooks, 2019 WL 1441628, at *7 (citing DeJarnette, 133 F.3d at 299)).

The record reflects that these are the reasons CB&T put forth for Newell's termination. Accordingly, the court finds that CB&T has satisfied its requirement of showing a legitimate, non-discriminatory reason for her termination.

### D. Plaintiff's showing of pretext

Once an employer has provided a non-discriminatory reason for the termination, "the burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the stated reason for the adverse employment action is a pretext and that the true reason is discriminatory." Guessous v. Fairview Prop. Invs., LLC, 828 F.3d 208, 216 (4th Cir. 2016). To demonstrate pretext, Newell must demonstrate that CB&T's reasoning for her termination is "unworthy of credence," Reeves, 530 U.S. at 143, "which requires more than a mere showing that the 'proffered reason is unpersuasive, or even obviously contrived,'" Brooks, 2019 WL 2019 WL 1441628, at *8 (quoting Reeves, 530 U.S. at 146). "It is not enough . . . to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination." St. Mary's Honor Ctr., 509 U.S. at 519.

Newell points to a few different incidents to show that CB&T's proffered reasons for her termination were pretext for age discrimination. First, she notes the comment that Kathy Gravely, the Retail Delivery Director/Retail Banking Director, made at an all-employees

meeting that "it was time for older people to go so younger people could come in." Pl. Memo.

Opp. Summ. J., ECF No. 57, at 7-8. She also alleges "statements made during group

teleconferences concerning the plans for the future of [CB&T] that included the hiring of new

people fresh out of college or banking school," ECF No. 57-24, at ¶ 8, and an incident in a

meeting where Zaccagnino did not say "that's a good idea" to one of her suggestions, but then

told a younger employee making a similar suggestion that it was a "brilliant" idea. Pl. Memo.

Opp. Summ. J., ECF No. 57, at 21. CB&T also formed a Young Professionals Group that

included only employees under the age of 40 and encouraged employees to save "enough" for

retirement. Id. at 22. Additionally, she states that while she was disciplined for making mistakes

while filing out employee disciplinary forms, a younger employee was not. Id. at 9. Finally,

Newell points to questions she received from CB&T management about her plans for

retirement. Id. a 6-7.

     The court finds that these statements do not show that CB&T's reasons for her

termination were pretextual. Turning first to Zaccagnino's comment about it being time for

"older people to go so that younger people could come in," the Fourth Circuit has generally

understood this sort of remark to "create no triable issue of age discrimination," Mereish v.

Walker, 359 F.3d 330, 336 (4th Cir. 2004). See id. at 337 (citing Birkbeck v. Marvel Lighting

Corp., 30 F.3d 507, 511-12 (4th Cir. 1994) ("holding that the statement that 'there comes a

time when we have to make way for younger people' is insufficient to create any 'inference of

age bias' because it is a stray remark which merely reflects a fact of life"); EEOC v. Clay

Printing Co., 955 F.2d 936, 942-43 (4th Cir.1992) ("holding that references to the need to

'attract newer, younger people' or 'young blood' were insufficient evidence of age bias because

they were isolated and merely reflected a truism of business life")). Such remarks are insufficient to establish that Newell's termination was motivated by age discrimination. The same applies for any statements made about hiring new people out of college and banking school. As for the formation of the Young Professionals Group, the existence of this group does not support an inference of age discrimination against Newell, especially since she has not pointed to any relationship between this group and herself or her termination. See Harper v. Arrow Electronics, No. 19-cv-02791, 2021 WL 37665, at *10 (D. Colo. Jan. 5, 2021) (holding that a comment that a "Young Professionals" event was "for young people" or "millennials" did not create an inference of age discrimination).

While Newell states that she was disciplined for the mistakes on discipline forms when a younger employee was not, Pl. Memo. Opp. Summ. J., ECF No. 57, at 9, she has not shown that she and that employee are similar situated "in all relevant aspects," including evidence that they "dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it," Haywood v. Locke, 387 F. App'x 355, 359 (4th Cir. 2010). "Two employees who do not report to the same supervisor, do not have the same job title, or do not have the same responsibility level, are not similarly situated." Brooks, 2019 WL 1441628, at *6 (quoting Monk v. Potter, 723 F. Supp. 2d 860, 877 (E.D. Va. 2010)).  Newell, who was an Assistant Vice President Branch Manager, held a different position than that employee, who was a Branch Manager. ECF No. 57-4, at 25. Newell has not provided any evidence that she and the other employee were otherwise

similarly situated, nor does she indicate that he is substantially younger so as to create an inference of age discrimination.

Additionally, management's questions about retirement do not support an inference of pretext. Without some sort of direct link from questions about retirement to a plaintiff's termination, courts have generally held that questions about retirement plans do not necessarily indicate age discrimination. See Wagoner v. Pfizer, Inc., 391 F. App'x 701, 708 (10th Cir. 2010) (rejecting inquiry into retirement plans as support for age bias); Kirkpatrick v. Pfizer, Inc., 391 F. App'x 712, 720 (10th Cir. 2010) (holding that a comment regarding plaintiff's retirement plans did not support age bias); Wallace v. O.C. Tanner Recognition Co., 299 F.3d 96, 100-01 (1st Cir. 2002) ("[C]ompany officials are permitted to gather information relevant to personnel planning without raising the specter of age discrimination."); Cox v. Dubuque Bank & Trust Co, 163 F.3d 492, 497 (8th Cir. 1998) ("[M]any courts have recognized that an employer may make reasonable inquiries into the retirement plans of its employees."); Zieglar v. Beverly Enters.-Minn., Inc., 133 F.3d 671, 676 n.3 (8th Cir. 1998) (holding that questions about an employee's retirement plans was insufficient to demonstrate age discrimination); Woythal v. Tex-Tenn Corp., 112 F.3d 243, 247 (6th Cir. 1997) (same); Colosi v. Electri-Flex Co., 965 F.2d 500, 502 (7th Cir. 1992) ("[A] company has a legitimate interest in learning its employees' plans for the future, and it would be absurd to deter such inquiries by treating them as evidence of unlawful conduct.).

Newell has failed to demonstrate that she was unlawfully discriminated against because of her age. Because she has not made out a prima facie case of discrimination, CB&T has provided legitimate and non-discriminatory reasons for her termination, and Newell has not

shown that those reasons were pretextual, the court will grant summary judgment for the defendant on Count I.

## IV. Count II—Retaliation and Retaliatory Discharge

Newell next alleges in her complaint that CB&T unlawfully retaliated against her for engaging in activity protected by the ADEA. In July 2019, Newell expressed to management her "opposition to Burnopp's discrimination" at a retirement party. Pl. Memo. Opp. Summ. J., ECF No. 57, at 4. Then in August 2019, she told Zaccagnino that she believed Burnopp's termination was age discrimination, and that if Burnopp ever needed Newell for anything that Newell would support her. Id. at 4-5. At her termination meeting, she states that Kerr said, "at least we're not embarrassing you," and Newell responded, "[y]ou mean like you did [sic] Donna Burnopp," to which both Kerr and Zaccagnino "hung their heads, not refuting what [Newell] had said." ECF No. 57-26, at 1. Newell argues that by terminating her, CB&T acted out of retaliation for her comments about Burnopp's termination.

The ADEA prohibits employers from discriminating against an employee who "has opposed any practice made unlawful by this section, or because such individual…has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter." 29 U.S.C. § 623(d). To establish a prima facie case of retaliation, Newell must demonstrate that (1) she engaged in protected activity; (2) her employer took adverse action against her; and (3) a causal connection existed between the protected activity and the adverse action. Causey v. Balog, 162 F.3d 795, 803 (4th Cir. 1998); Kerney v. Mountain States Health Alliance, 894 F. Supp. 2d 776, 782 (W.D. Va. 2012).

Participation in protected activity includes conduct where an individual has "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation" under the ADEA. 29 U.S.C. § 623(d). "Opposition" occurs when a plaintiff acts in a manner that opposes any practice made unlawful by the ADEA. Id. The Supreme Court has defined "oppose" by looking to its plain meaning: "to resist or antagonize . . . ; to contend against; to confront; resist; withstand, . . . to be hostile or adverse to, as in opinion.'" DeMasters v. Carilion Clinic, 796 F.3d 409, 416 (4th Cir. 2015) (quoting Crawford v. Metro. Gov't of Nashville & Davidson Cnty., 555 U.S. 271, 276 (2009)). "[T]he threshold for oppositional conduct is not onerous." Id. at 417. "[W]hen an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication virtually always constitutes the employee's opposition to the activity." Crawford, 555 U.S. at 276 (internal citation omitted).

Assuming that Newell's comments constituted protected activity under the ADEA, the court finds that Newell has failed to produce sufficient evidence that shows a causal connection between her protected activity and her termination. The only evidence that she offers for the casual connection between her statements and her termination is that Kerr and Zaccagnino did not respond to her comment about Burnopp during the termination meeting, and that they "hung their heads." Refusal to discuss the termination of another employee during Newell's termination meeting does not create an inference that Newell's termination was somehow linked to her statements about Burnopp. Furthermore, as discussed above, see Part III.B, the record shows that CB&T believed it had legitimate, non-discriminatory reasons for firing Newell that had nothing to do with Burnopp nor any related statements she had

made. And while Newell claims that other employees who did not complain about CB&T's alleged discrimination against Burnopp were treated differently, Pl. Memo. Opp. Summ. J., ECF No. 57, at 23, she does not present any evidence to support her claims. These claims also concern violations of different bank policies that are not akin to any of her disciplinary issues. Id. Importantly, Newell's statements to Kerr and Zaccagnino—both employees involved in her termination—were made nearly nine months before her termination. See Boyd v. K-VA-T Food Stores, Inc., No. 1:20-cv-023, 2021 WL 2720102, *5 (W.D. Va. July 1, 2021) ("The Fourth Circuit has stated generally that 'a lapse of three to four months between the employer's knowledge of protected activity and the alleged retaliation is too long to establish a causal connection by temporary proximity alone.'" (quoting Roberts v. Glenn Indus. Grp., Inc., 998 F.3d 111, 127 (4th Cir. 2021))).

Newell has not pointed to evidence sufficient to prove causation for a prima facie case of retaliation. Therefore, the court grants summary judgment on the retaliation claim.

## V. Count III—Disability Discrimination

To survive summary judgment on an ADAAA discrimination claim, Plaintiff must "produce evidence sufficient to demonstrate" (1) she "was a qualified individual with a disability"; (2) she "was discharged"; (3) she "was fulfilling [her] employer's legitimate expectations at the time of discharge"; and (4) "the circumstances of [her] discharge raise a reasonable inference of unlawful discrimination." Reynolds v. Am. Nat'l Red Cross, 701 F.3d 143, 150 (4th Cir. 2012) (quoting Rohan v. Networks Presentations LLC, 375 F.3d 266, 273 n.9 (4th Cir. 2004)). She must also demonstrate that her disability "was the but-for cause" of her termination. Crews-Sanchez v. Frito Lay, Inc., 6:21-cv-00030, 2022 WL 2792207, at *8.

The first and second elements are not in dispute. Newell suffers from Macular Corneal Dystrophy, Minimal Change Disease, Graves' Disease, Casselman's Disease, and diverticulosis. Am. Compl., ECF No. 13, at ¶ 125. The court has established above that the third element of "fulfilling [her] employer's legitimate expectations at the time of discharge" has not been met. See Part III.B. Assuming, however, that she has met this requirement, the court also finds that she has not demonstrated that her disability was the "but-for" cause of her termination.

Newell states that Kerr discriminated against her as a person with a disability by noting in a performance review that Newell struggled with the computer, which Kerr said was "medical" in nature, and that Newell needed "assistance with technology at times." Pl. Memo. Opp. Summ. J., ECF No. 57, at 24-25. She argues that this performance review and its temporal proximity to questions she received about her retirement demonstrate that her disability was the but-for cause of her termination. Id. at 25. The court finds that these facts do not raise a reasonable inference of unlawful discrimination. There is no indication that her disability or the mention of it is related to her termination, which occurred almost a year after that performance evaluation was completed. Pl. Memo. Opp. Summ. J., ECF No. 57, at 4. When asked whether her medical conditions were discussed at her termination meeting, she responded no. ECF No. 55-10, at 18. The statement about her medical condition does not demonstrate any sort of underlying discriminatory intent or motive, nor has Newell presented evidence linking it to her termination.

Accordingly, the court grants summary judgment on the claim of disability discrimination.

## VI. CONCLUSION

For the foregoing reasons, CB&T's motion for summary judgment is **GRANTED** in its entirety and this case is **DISMISSED**. An appropriate order will be entered.

It is **SO ORDERED.**

Entered: February 17, 2023

Digitally signed by Michael F.
Urbanski      Chief U.S. District
Judge
Date: 2023.02.17 14:45:40 -05'00'

Michael F. Urbanski
Chief United States District Judge

21